# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
TOZZI, CELTNIEKS, and BURTON
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Major ERIK J. BURRIS**
**United States Army, Appellant**

ARMY 20150047

Headquarters, Fort Bragg
Tara A. Osborn, Military Judge (arraignment)
John T. Rothwell, Military Judge (trial)
Lieutenant Colonel Jerrett W. Dunlap, Jr., Staff Judge Advocate

For Appellant:  Mr. Zachary D. Spilman, Esquire (argued); Major Christopher D. Coleman, JA; Mr. Zachary D. Spilman, Esquire (on brief and reply brief).

For Appellee:  Captain Linda Chavez, JA (argued); Lieutenant Colonel A.G. Courie III, JA; Major Cormac M. Smith, JA; Captain Linda Chavez, JA (on brief).

8 May 2017

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

BURTON, Judge:

In this appeal, we find appellant waived his right to claim impermissible character evidence and improper argument because he failed to object at trial.  In addition, we find appellant failed to meet his burden to prove his defense counsel were ineffective.

An officer panel sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of willfully disobeying a superior commissioned officer, two specifications of rape, one specification of sodomy, and four specifications of assault consummated by a battery, in violation of Articles 90, 120, 125, and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 890, 920, 925, 928 (2006 & Supp. III 2010; 2006 & Supp. IV 2011; 2006 & Supp. V 2012; 2012)

[hereinafter UCMJ].[1] The panel sentenced appellant to a dismissal, confinement for twenty years, and forfeiture of all pay and allowances. The convening authority approved the sentence as adjudged, but waived automatic forfeitures for six months.

This case is before us for review pursuant to Article 66, UCMJ. Appellant raises ten assignments of error, three of which merit discussion, but no relief. Appellant personally raised several matters pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), including ineffective assistance of counsel during sentencing. These matters also warrant no relief, but the claim of ineffective assistance of counsel will be discussed in conjunction with the assigned error addressing this issue.

## BACKGROUND

Appellant, a judge advocate,[2] met his second wife, WB, in January 2009 while he was stationed at Fort Hood, Texas. They married in March 2010. From the inception of their marriage through November 2012, appellant assaulted, forcibly engaged in sex with, and sodomized WB. Initially, WB did not report these instances of abuse because she was embarrassed and feared no one would believe her. When WB reported appellant's actions, he was serving as the Chief of Justice (CoJ) for the 82d Airborne Division at Fort Bragg, North Carolina.

Appellant had a daughter from his first marriage, DB. When his daughter would visit, he engaged in what he called "tickle torture." Witnesses testified that initially his daughter laughed when he tickled her. As DB grew older, she started to dislike "tickle torture" and believed he engaged in "tickle torture" as punishment. She expressed her dislike to appellant by telling him she did not like it and would try to get away from him when he engaged in "tickle torture."

In his duties as CoJ, appellant had access to the shared computer drive where documents pertaining to ongoing investigations were stored. When documents pertaining to appellant's investigation were discovered on his government-issued computer, he was counselled in writing to "return all DVDs or CDs or electronic media you recently produced or copied from the 82d Airborne OSJA." Appellant

---

[1] Although appellant was charged with assaulting and raping his wife "on divers occasions" for two of the assault specifications and one of the rape specifications, the panel found him guilty of a single instance in each of the charged offenses.

[2] According to his Officer Record Brief, appellant received a juris doctorate degree from Texas Tech University in 2007, and attended the Judge Advocate Officer's Basic Course in 2008. As a judge advocate, appellant served as trial counsel and administrative law attorney at Fort Hood, prior to serving as the CoJ at Fort Bragg.

responded in writing, "I will get back with LTC Thomson about the CDs mentioned once I look for/find them and have discussed the same with defense counsel, but will give an update to him before COB today." Appellant never returned any DVDs or CDs to the 82d Airborne Division's Office of the Staff Judge Advocate.

### A. Improper Character Evidence and Argument

In a videotaped Criminal Investigation Command (CID) interview, appellant told a special agent about his nickname, "The Beast." At trial, the government used appellant's nickname throughout its case to highlight the domestic violence incidents and to counter appellant's "good soldier" defense. For example, during WB's testimony, she referenced "The Beast" when describing different instances of assault, rape, and sodomy. According to WB, after the first time appellant raped her, she asked him, "'Why did you do that? You hurt me.' . . . 'Why didn't you stop?' . . . 'It hurt me.'" After appellant stopped laughing he responded, "'Oh, you must have been talking about The Beast. You met The Beast last night.' . . . 'Oh, that's a name I nicknamed -- the girls in college that happened to and they nicknamed -- calls it The Beast.'" The CID interview, which included appellant's description about the origins of his nickname, was also admitted into evidence and played in its entirety to the panel. In closing argument, trial counsel used the term "The Beast" or "a beast" nine times.

On appeal, appellant alleges the numerous references to him as "The Beast" were impermissible character evidence and improper argument. Appellant also argues the government improperly commented on his constitutional right to remain silent during closing argument. As a threshold matter, we must determine in each instance whether appellant preserved his right to claim error, or waived his claim by failing to object at trial.

In general, "'[d]eviation from a legal rule is error unless the rule has been waived.'" *United States v. Ahern*, __ M.J. ___, 2017 CAAF LEXIS 292, at *7 (C.A.A.F. Apr. 20, 2017) (quoting *United States v. Girouard*, 70 M.J. 5, 10 (C.A.A.F. 2011)). As our superior court has explained, "[while an appellate court] reviews forfeited issues for plain error, *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009), [appellate courts] do not review waived issues because a valid waiver leaves no error to correct on appeal." *Id.* (citing *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009)). Whether an appellant has waived an issue is a question of law we review de novo. *Id.* at *8 (citing *United States v. Rosenthal*, 62 M.J. 261, 262 (C.A.A.F. 2005)).

Regarding evidentiary errors, "[a] party may claim error in a ruling to admit or exclude evidence only if the error materially prejudices a substantial right of the party and: *if . . . a party, on the record: timely objects* or moves to strike . . . ." Military Rule of Evidence [hereinafter Mil. R. Evid.] 103(a) (emphasis added).

However, "[a] military judge *may* take notice of a plain error that materially prejudices a substantial right, even if the claim of error was not properly preserved." Mil. R. Evid. 103(f) (emphasis added). Regarding argument by counsel, "*[f]ailure to object to improper argument* before the military judge begins to instruct the members on findings *shall constitute waiver* of the objection." Rule for Courts-Martial [hereinafter R.C.M.] 919(c) (emphasis added).

### 1. *"The Beast"*

Appellant failed to object to a single reference of "The Beast" during the admission of evidence or during argument. Accordingly, this issue is waived and there is no legal error to correct on appeal. Moreover, there is no cause for us to exercise our discretionary authority to address this issue notwithstanding appellant's waiver. Although "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait[,]" the term "The Beast" is not a character trait. Mil. R. Evid. 404(a)(1). It is appellant's self-imposed nickname, and it is not "'necessarily suggestive of a criminal disposition.'" *United States v. Farmer*, 583 F.3d 131, 145 (2d Cir. 2009) (quoting *United States v. Dean*, 59 F.3d 1479, 1492 (5th Cir. 1995)).[3] Because the use of appellant's nickname is not character evidence, there is no reason for this court to look beyond appellant's clear waiver.

### 2. *Right to Remain Silent*

During closing argument, trial counsel stated the following:

> Who is so many people's source of information in this case, who didn't walk into this courtroom and talk to you -- 95 percent of the time, what was the answer when asked? "[Appellant] told me." "[Appellant] told me that the initial report was just domestic violence." If you're Brandon Hobgood, "[Appellant] called me and told me that [WB] said these things." If you're [appellant's] family, Kristin Beilman or her husband, "Well, we met

---

[3] In *Farmer*, the trial judge overruled the defendant's objection to the use of his nickname, "Murder," even though he was charged with murder and attempted murder. 583 F.3d at 135. The appellate court found "the main problem was not the admission of the nickname into evidence. Rather, it was the prosecutors' frequently repeated, gratuitous invocation of [the] nickname" that "amounted to a 'flagrant abuse.'" *Id.* at 146-147 (quoting *United States v. Coriaty*, 300 F.3d 244, 255 (2d Cir. 2002)). In *Farmer*, the nickname "Murder" was used nearly thirty times in the rebuttal argument. *Id.* at 144. In the case at hand, appellant's nickname is not repeated frequently nor is it a gratuitous invocation rising to flagrant abuse.

[WB] twice; but [appellant] told us these things about her."

[WB] is isolated, and she is not controlling the dialogue. [Appellant] is controlling the dialogue. And you saw that, too. Watch that CID video. Watch that push of information. Watch that display with [Special Agent AT] about what he knows and how he knows it. It's exactly what [WB] feared. And it is reasonable to think, "If I leave and the person -- if I call someone and the very person they are going to turn to, to find out what's going on is linked with my husband, who am I really turning to at all?" That isn't an option. She doesn't have an option.

Defense counsel did not object to this portion of trial counsel's argument. After trial counsel finished her closing argument and before defense started his argument, the military judge sua sponte excused the members and stated the following:

[MJ:] Counsel, during closing -- and it may have been inadvertent and I may be paraphrasing here but I believe the statement was made, "Who is the person giving them all the information, who didn't walk in here and talk to you? [Appellant]." I mean, I don't know -- I may have misinterpreted that.

ATC: No, sir. That was not what I -- yeah.

MJ: But I didn't raise it then. I didn't hear an objection. Obviously, my concern is, you know, it could be interpreted as a comment on the accused's failure to testify.

Defense, do you want me to give any kind of curative instruction based on that?

. . . .

CDC: Judge, I heard it the way you heard it. I heard it as an impermissible instruction on the accused's failure to testify. We didn't want the instruction.

MJ: No. I understand. That's why ----

5

CDC:  Now we are put into a bit of a box because we have to make a decision on something that the government put in.  I'd like to be able to speak to my [co-counsel] and see what we can proffer up to be a reasonable -- see if there is any solution.  We didn't poison the well, Judge, obviously.

MJ:  I understand, and I don't think it was an intentional if it was ----

CDC:  I'm not saying it was but ----

MJ:  I understand.

CDC:  But I heard it in the same vain you did.

. . . .

MJ:  May I listen to the tape?

[The court reporter conferred with the military judge.]

MJ:  Court's in recess.

The military judge recessed the court-martial and held a R.C.M. 802 conference during which the parties and the military judge listened to the audio recording of trial counsel's closing argument.  Following the recess, the military judge held an Article 39(a), UCMJ, session during which the following ensued:

[MJ:]  During the recess, both I and counsel listened to the audio.  I believe it can be interpreted a couple of different ways.  One as was described, another with respect to a voice inflection and intonation and pause in the argument.

Also during the [R.C.M. 802 conference], I believe defense counsel indicated something that might alleviate the problem during the next session.

Is there anything that either party wishes to add to this on this issue?

TC:  No, Your Honor.

CDC:  No, Your Honor.

> ATC: Actually -- I apologize, sir. Just to make -- that the defense's plan was to do that prior to any of this popping up on the record either. You know what I mean, it wasn't like ----
>
> MJ: Right.
>
> ATC: ---- this concern changed the tides or anything like that.
>
> MJ: Okay. Thank you, Government.

Defense counsel offered no additions or corrections to the military judge's summary of the R.C.M. 802 conference. When the court-martial was called to order and the panel returned, defense counsel gave his closing argument in which he stated: "[Appellant] didn't testify in this case because that says it best. That video[4] was pure and raw and honest. There was no need."

Based on the facts in this case, we conclude appellant waived his right to raise this issue on appeal. "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *Gladue*, 67 M.J. at 313 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). When the military judge directed defense counsel's attention to trial counsel's potentially improper argument, the right to object became a "known right." After listening to the audio recording of trial counsel's argument and conferring with co-counsel during a recess, appellant, through counsel, intentionally abandoned his right to object and obtain a judicial remedy. Instead of a judicial remedy, defense counsel chose to address the potentially improper argument with counter-argument.[5]

Even assuming appellant preserved this issue for appellate review by simply agreeing with the military judge, we find neither error in nor prejudice from trial counsel's argument. As the military judge correctly observed, trial counsel's comments could be interpreted multiple ways. In its full context, trial counsel's

---

[4] The video of appellant's interview with CID was admitted into evidence and played in its entirety during the government's case.

[5] Defense counsel claimed during the Article 39(a), UCMJ, session that he recognized trial counsel's potentially improper argument before the military judge intervened sua sponte. Defense counsel also indicated during the R.C.M. 802 conference that he originally intended to address the potentially improper argument with counter-argument. Essentially, the military judge's intervention did not change defense counsel's initial preference to forego a judicial remedy.

reference to appellant as the common source of information for defense witnesses, "did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Darden v. Wainwright*, 477 U.S. 168, 182 (1986). Even if this argument indirectly or by innuendo commented on appellant's exercise of a fundamental right, the comments were a reasonable inference drawn from the testimony of Mr. Hobgood, Mrs. Beilman, and Mr. Aaron Beilman.

Further assuming constitutional error, we are convinced beyond a reasonable doubt appellant suffered no prejudice. After the defense team consulted with each other during a recess, they made a tactical decision to decline a curative instruction from the military judge. Instead, defense counsel chose to address the issue with counter-argument, which was their original strategy. In short, the military judge not only elicited defense counsel's preferred remedy on the record, he also acquiesced to their post-consultation preference.

Under the circumstances of this case, we find appellant failed to preserve a claim of error by merely agreeing with the military judge's sua sponte identification of potential error. Even assuming, *arguendo*, appellant did not waive the issue, we find no error and no prejudice. Accordingly, appellant is not entitled to relief.

### B. Ineffective Assistance of Counsel

Whether counsel provided ineffective assistance is a question of law reviewed de novo. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (quoting *United States v. Gutierrez*, 66 M.J. 329, 330-31 (C.A.A.F. 2008)). "Even under de novo review, the standard for judging counsel's representation is a most deferential one." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (emphasis omitted).

The Sixth Amendment guarantees an accused the right to the effective assistance of counsel. *United States v. Gooch*, 69 M.J. 353, 361 (C.A.A.F. 2011) (citing *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001)). To establish that his counsel was ineffective, appellant must satisfy the two-part test, "both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to

8

> eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (internal quotation marks and citations omitted).

The *Strickland* framework was adopted by the military justice system and further developed into a three-pronged test to determine whether an appellant has overcome the presumption of competence and shown prejudice:

> (1) Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions?";
>
> (2) If the allegations are true, did defense counsel's level of advocacy fall "measurably below the performance . . . [ordinarily expected] of fallible lawyers?"; and
>
> (3) If defense counsel was ineffective, is there a "reasonable probability that, absent the errors," there would have been a different result?

*United States v. Grigoruk*, 56 M.J. 304, 307 (C.A.A.F. 2002) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). In adopting the *Strickland* framework, our superior court has maintained the strong deference to counsel's tactical decisions and rejected the advantages of hindsight. *See United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) ("Thus, our scrutiny of a trial defense counsel's performance is 'highly deferential,' and we make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the time.'").

Moreover, our review of ineffectiveness is not based on a single act of counsel, but by considering counsel's overall performance. *See United States v. Murphy*, 50 M.J. 4, 8 (C.A.A.F. 1998) ("When we look for effective assistance, we do not scrutinize each and every movement or statement of counsel. Rather, we satisfy ourselves that an accused has had counsel who, by his or her representation,

9

made the adversarial proceedings work."). Similarly, where an appellant was represented by multiple counsel, their performance is judged as a team, not by considering only one or more individual counsel. *United States v. McConnell*, 55 M.J. 479, 481 (C.A.A.F. 2001).

Regarding counsel's performance after findings, "defense counsel may be ineffective at the sentencing phase when counsel either 'fails to investigate adequately the possibility of evidence that would be of value to the accused in presenting a case in extenuation and mitigation or, having discovered such evidence, neglects to introduce that evidence before the court-martial.'" *United States v. Alves*, 53 M.J. 286, 289 (C.A.A.F. 2000) (quoting *United States v. Boone*, 49 M.J. 187, 196 (C.A.A.F. 1998)). When assessing the second prong, appellant "'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Green*, 68 M.J. at 362 (quoting *Strickland*, 466 U.S. at 698).

In this case, appellant was represented by a military defense counsel (DC), an individual military counsel (IMC), and a civilian defense counsel (CDC). During the trial, the CDC became ill and was taken to a hospital. Although the CDC later returned to trial, he was not present when the panel announced its findings. In addition, the CDC was not present during presentencing because he was excused by appellant since the DC and IMC "were comfortable" going forward without him.

On appeal, appellant, both personally and through appellate defense counsel, alleges his trial defense counsel were ineffective during presentencing because they did not prepare for the possibility of his conviction. Specifically, appellant claims his defense counsel failed to investigate possible matters in extenuation and mitigation, identify a sufficient number of potential witnesses, prepare and control the few witnesses who did testify, present a "good soldier book," and advise him to apologize in his unsworn statement.

*1. Investigating Matters in Extenuation and Mitigation, and Presentencing Witness Identification and Preparation*

In his affidavit, appellant states:

> Everyone on my defense team was blown away by the findings. They only considered the possibility of an assault of my wife as a possible conviction. They did minimal pre-trial sentencing preparation based only on that possibility. When the findings were announced, there was total disbelief from my counsel. They were totally unprepared to handle a sentencing case that involved sex offense convictions.

> . . . .

> At no point in the preparation of the case did my defense counsel ask about witnesses who would testify to accomplishments of my military career. We discussed character witnesses for the merits portion of the case, but we never discussed calling witnesses who could describe the things I did during my military career. We did not even put together the sentencing materials until we were waiting for findings to be announced. They had a paralegal print out photographs for me to submit.

First, we reject appellant's factual assertion that sentencing was not considered until after findings. Appellant acknowledges as much in his affidavit:

> The first time *I had a substantive conversation about pre-sentencing proceedings with my counsel* was when I brought up sentencing *about a week or a week and a half before my court-martial.* I asked them what we were going to do if I was convicted of any of the charges. I asked them specifically about a Good Soldier Book. They said we should probably get something together, including letters of support and awards. However *I was the person who reached out to people through email and Facebook asking for letters of support.*

(emphasis added). In the post-trial affidavits ordered by this court, the IMC and DC admitted they, too, were "shocked" and "surprised" by the verdict. However, despite their disappointment, it is clear from the record and defense counsel's sworn affidavits that their strategic decision to raise the "good soldier defense" on the merits involved the investigation and presentation of evidence typically reserved for presentencing. As our superior court has held, even defense counsel's post-findings surprise and regret, without more, do not establish deficient performance by counsel. *See United States v. Smith*, 48 M.J. 136, 137-38 (C.A.A.F. 1998) ("We hold that the assertions of appellant's trial defense counsel, which reflect counsel's remorse and disappointment with the ultimate resolution of the case, do not establish ineffective assistance of counsel under [*Strickland.*] . . . A post-trial attack, even when self-initiated by trial defense counsel, requires more than counsel's regret as support.").

Second, appellant has failed to show a reasonable probability his sentence would have been different even if his claims were true—that his counsel were "unprepared to handle a sentencing case that involved sex offense convictions" as opposed to one that involved "an assault of [WB.]" The "good soldier defense" his counsel put forth was equally applicable during presentencing to sex offense

11

convictions as domestic violence convictions. Specifically, defense counsel called ten witnesses who testified about appellant's good military character. Defense counsel also used a government witness to discuss appellant's good duty performance. Although testifying on the merits, these witnesses covered appellant's entire military career, including his time as a field artillery officer and a judge advocate. They testified about his good duty performance at various duty locations including his deployment to Iraq and his attendance at The Judge Advocate General's Officer Graduate Course.

Defense counsel referenced the testimony of these witnesses in their presentencing argument. The military judge instructed the panel prior to sentencing they could consider all the witnesses who testified on the merits as to appellant's character. Accordingly, it was a reasonable tactical decision for defense counsel not to recall all of these witnesses during presentencing. In similar circumstances, our superior court has found counsel's decision to reference, rather than repeat, the earlier testimony of a merits witness was not ineffective for sentencing. *See United States v. Perez*, 64 M.J. 239, 244 (C.A.A.F. 2006) ("[W]e note that defense counsel's sentencing argument expressly referenced the 'good soldier' testimony that the witness had provided during the findings portion of trial. Moreover, by referring to earlier testimony rather than recalling the witness, the defense was able to avoid the risk of cross-examination.").

In addition to documentary evidence and appellant's unsworn statement, defense counsel did recall three witnesses during presentencing—Dr. Mark Whitehill, a licensed psychologist and certified sex offender treatment provider; Mr. Galen Burris, appellant's father; and Mrs. Beilman, appellant's sister. Dr. Whitehill explained his clinical assessment that appellant has a personality disorder, but is a low-level risk to reoffend and commit sexual violence. Even ignoring whether his testimony offers further proof counsel were prepared for a sentencing case involving sex offenses, appellant has failed to show what else Dr. Whitehill could have testified to if he had been more fully prepared by counsel.[6]

---

[6] While appellant asserts that Dr. Whitehill only spoke with him between the announcement of findings and the presentencing proceedings, it is clear from the record that Dr. Whitehill prepared for testifying as an expert witness. Dr. Whitehill reviewed the complete report from appellant's mental examination by the R.C.M. 706 board. Although the government elicited information pertaining to appellant's personality disorder, this is not evidence of a lack of preparation. The DC admits in her affidavit that she considered this matter prior to calling Dr. Whitehill and made a tactical decision to call him because she believed the benefits from his opinion about appellant's low risk of recidivism outweighed information about a personality disorder.

Although appellant attempts to show prejudice by reference to other witnesses, we find those efforts similarly inadequate and mere speculation. Appellant admits he did not provide counsel with a list of "numerous individuals who" he claims "would have testified on [his] behalf in sentencing." While appellant now states his desire to call additional witnesses, with the exception of his sister, there are no affidavits confirming the desired witnesses were willing to testify favorably on his behalf. Essentially, appellant asks this court to presume he was prejudiced when counsel failed to discover unspecified witnesses or recall merits witnesses to provide unspecified testimony. We cannot presume what appellant has the burden to show. *See Alves*, 53 M.J. at 289-90.

### 2. Control of Witness Testimony

Appellant now claims counsel did "almost no preparation with my sister [Mrs. Beilman.]" He believes his sister should have been asked about aspects of his life including: his childhood, times he defended women against violence, rescued animals, coached a girls soccer team, and his numerous volunteer activities. He also alleges his counsel did not discuss with Mrs. Beilman the relevance of attacking WB and the trial counsel, or the wisdom of commenting "about evil women or what it would be like to be married to an evil woman."

Mrs. Beilman submitted an affidavit in which she stated, "I recall [the IMC] approaching me and asking me if I was going to be able to testify for [appellant's] sentencing as I was noticeably distraught and crying, but he did not prepare me." She further states:

> I know that [appellant] was wrongfully convicted. I have regrets about some of the statements I made during my sentencing testimony and I believe that my words, while spoken in grief, are not in my true character and also contributed to the length of [appellant's] sentence. I really had no understanding how all the words I said on the stand could affect that decision. Prior to [the IMC's] affidavit I had never heard the term "impeaching the verdict." When I testified in the sentencing proceeding I simply reacted to the pain that I and my family were experiencing. I was not guided through the range of emotions I was experiencing or helped to convey the message I really wanted to.
>
> If I could do it again, my testimony would be different.

While Mrs. Beilman's post-trial reflection on her testimony with the benefit of hindsight is understandable, we cannot rely on the same benefit in our appellate review. Furthermore, her belief, no matter how deeply felt, that the panel increased

13

appellant's punishment because she "impeached the verdict" and criticized the trial counsel is speculation. In contrast to her post-trial assessments, her claim that she was inadequately prepared by counsel *before* testifying during presentencing requires closer examination of the record.

During presentencing, Mrs. Beilman was very responsive to the IMC's questions despite the fact she was emotional and crying. After she answered the IMC's final question, neither the government nor the panel members had any questions for her. As she was about to be permanently excused, Mrs. Beilman asked the military judge, "May I say something?" The military judge responded, "Counsel? You can answer questions from counsel." She responded, "I will." It is clear from the context that Mrs. Beilman's request to make a final comment was not planned. At this juncture, the IMC had little time to make a critical decision in front of the panel. The IMC could have concluded his examination without giving her the opportunity to express her final thought. However, this may have left the panel confused and possibly prompted a panel member to ask a question to allow her to continue to speak. If counsel had chosen this tactic, we could be faced with a similar question whether counsel were ineffective because they prevented a witness from providing additional mitigation evidence. In the alternative, the IMC could have requested a recess to determine what Mrs. Beilman wanted to say, but even if granted it could undermine her testimony as overtly crafted and prescreened. Under these circumstances, the IMC made a tactical decision to permit her final comment and asked, "Ma'am, do you have anything else you want to say?" The following colloquy occurred:

> A: Yes. When his oldest daughter was a few years old, [appellant] was in law school; and he was studying hard and he was exhausted. . . .
>
> . . . .
>
> And for [WB], [DB] was proof that he could have children. That's what [DB] was to [WB]. And her time was running out. I am a woman, and I know women. And I'm ashamed to be one of them sometimes because they have no moral class anymore.
>
> And for [WB], once she got her kids, I always knew that for her if it worked out, it worked out. And, if not, she had Daddy welfare; and that is who [WB] is. And she managed to sit up here and cry those tears. They are not real -- they're not real.
>
> *And that prosecutor -- that blonde prosecutor with the bun, can smirk during my testimony and comment that -- I*

14

> *see something in someone's eyes -- so disrespectful.  And I*
> *want you to think about this and that when you sleep --*
> *and when my niece's grow up, maybe they'll marry your*
> *son. Then you'll know what it feels like to know an evil*
> *woman ----*
>
> MJ:  Counsel?
>
> WIT:  I'm done. [Crying.]
>
> IMC:  Thank you, ma'am.
>
> WIT:  My brother is worthy of wonderful things in his
> life.  [Crying.]
>
> I love you, and I am proud of you.  And you keep fighting
> because you're my hero.
>
> [Pause.]
>
> MJ:  Let's take a brief recess.  Court's in recess.
>
> [The witness withdrew.]

(emphasis added).  Appellant's criticism of the IMC's decision to permit Mrs. Beilman's to make a final comment is based entirely on hindsight.  Even in hindsight, the IMC believes he made the correct decision in not abruptly terminating Mrs. Beilman's final statement.  The IMC states in his affidavit:

> I did not intervene because in my personal and
> professional opinion, the panel got it wrong; I felt that any
> uneasiness by panel members in their findings may
> potentially have resulted in a more lenient sentence.
> Moreover, I figured that allowing a third party witness to
> impeach the verdict versus doing it myself – or through
> [appellant] – would be an effective way to plant the seed
> while not overtly making that argument, potentially
> offending the members.  In other words, as litigation
> strategy, I attempted to walk the fine line.

We do not rely on the hindsight of appellant, the witness, or counsel to resolve this question.  It is clear from the record of trial that Mrs. Beilman was sufficiently prepared to understand counsel's questions and, apart from *her* impromptu concluding remarks, to provide favorable testimony.  Without more, an affiant's post-trial regret and speculation, like lack of memory, are far too equivocal

15

and ambiguous a complaint to overcome the strong presumption of counsel's competence. *See United States v. Key*, 57 M.J. 246, 249 (C.A.A.F. 2002) (finding broad, generalized accusations from an affiant are insufficient to prove counsel were ineffective). Moreover, there is no evidence to suggest the panel rejected the military judge's instructions on the proper basis for a sentence and instead punished appellant for the errant comments from his sister.

### 3. *Good Soldier Book*

There is no blueprint for the contents of a "good soldier book." Although not in book format, defense counsel submitted twelve letters of support and appellant's military awards and certificates, which included two Bronze Stars, a Meritorious Service Medal, a Joint Service Commendation Medal, and two Army Achievement Medals. Defense counsel also submitted appellant's academic awards and certifications from the Texas Tech University School of Law. In addition, the panel received pictures of appellant with his family and appellant's officer record brief. These documents, combined with the "good soldier" testimony on the merits, paint a picture of appellant's military career and served the same purpose as a "good soldier book." Although appellant notes he had to request letters of support, this is not an uncommon or unreasonable practice as appellant would know people who would be willing to support him. Significantly, appellant does not proffer any additional evidence he wanted to submit on his behalf. Accordingly, appellant has failed to show deficient conduct or prejudice.

### 4. *Unsworn Statement*

While not wholly unfettered, an accused has a broad right to make an unsworn statement during presentencing, and may not be cross-examined by the trial counsel or the court-martial. *United States v. Grill*, 48 M.J. 131, 133 (C.A.A.F. 1998); R.C.M. 1001(c)(2). While R.C.M. 1001(c)(2)(A) purports to limit an accused's unsworn statement to matters "in extenuation, in mitigation or to rebut matters presented by the prosecution," this limit has never been strictly enforced in light of its traditional place as "an important right at military law." *Grill*, 48 M.J. at 133. Accordingly, the unsworn statement remains "an opportunity for an accused to bring information to the attention of the members or a military judge . . . without ordinary evidentiary constraints." *United States v. Johnson*, 62 M.J. 31, 37 (C.A.A.F. 2005).

Appellant is clear that he briefly discussed with his counsel what he would say if he made an unsworn statement, which included an emphatic resolve that he "was not going to apologize for anything." Instead, appellant exercised his broad right to make an unsworn statement as follows:

> Members of the Panel, thank you. Thank you for listening to this case. Thank you for deliberating on the evidence that you heard. Thank you for reaching a decision.

I want to believe, I have to believe, and I trust that each of you are great officers, great Americans and you believe you did the right thing. I trust that.

To the extent that you found me guilty of rape and spousal abuse, *I must apologize to you, because I cannot offer you an apology.* I do not challenge your decision. I do not challenge any of you. But I have never, nor shall I ever, *admit* to having raped my wife or beaten her. Whatever vestiges of honor I have left, whatever shreds of honor I may have left, I'm going to fight to cling onto. And one of those is the truth.

What I did hear, *what hurts me unbelievably is that -- that excessive horseplay, being too rough with my eldest daughter has caused her any pain, has caused her any grief* and, as the letter you've just heard, has caused her to ultimately hate me.

There is nothing more precious in this world to me than those that I love, and there is nothing more precious to me than my three girls. I love them dearly.

As a result of this court-martial, it's safe to say I will not be seeing them again. To that end, I would ask one woman in this courtroom that I see, please take care of those girls. I will love them beyond my lifetime.

Again, I want to thank you for what you've done, and I trust you did what you felt was right.

In addition to that, though I have just a few friends in the -- in the gallery right now. I want to say that I have experienced an unbelievable, overflowing show of support, trust, faith, confidence, from -- from friends that I could never have imagined.

At this moment, I should probably feel some kind of -- at this moment, honestly, I think more than -- I feel more joy than anything else for the friends and my family that have supported and have believed me through this entire process. To that end, thank you.

To my counsels who have been with me so long now, I can actually call them friend. I am overwhelmed.

17

> I'm not going to take up more of your time. *I'm not going to ask you to give me some ridiculously short sentence.* You've convicted me of some serious things and you need to think about that and an appropriate sentence.
>
> But I've served my country, my community, and my family, my entire life. I ask that you give me a chance to return to doing those same things in some capacity at some point. Thank you.

(emphasis added). Appellant chose not to apologize, as is his right. There is no requirement for an appellant to apologize during an unsworn statement or forfeit the right to make one. Confronted with appellant's emphatic refusal to apologize, it was reasonable for defense counsel to encourage him to express remorse in his own words as opposed to pressuring him to make an insincere apology.[7] Ultimately, defense counsel had no authority to prevent appellant from making an unsworn statement, or advising him that he *must* apologize or forego his right altogether. Absent extraordinary circumstances, these decisions made by counsel are exactly the type of tactical decisions relevant case law instructs us not to second guess. As such, we will not do so here.

Under the circumstances of this case, we see no need to order a fact-finding hearing pursuant to *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967). The facts in appellant's allegations—even if true—would not result in relief. *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997). Furthermore, "the appellate filings and the record as a whole 'compellingly demonstrate' the improbability of [appellant's allegations]." *Id*. Applying the first, second, and fourth *Ginn* principles to appellant's submission, we reject appellant's ineffective assistance claim. In short, defense counsel made objectively reasonable choices in strategy from available alternatives. Appellant's assertions that his defense counsel provided ineffective assistance lack merit.

---

[7] Whether to give an accused the generally prudent advice to apologize to the victims during an unsworn statement is a tactical decision that requires case-specific analysis by defense counsel. While the benefits of a genuine expression of remorse are obvious, a "shallow, artificial, or contrived" expression of remorse can have potentially negative effects during the government's rebuttal. *United States v. Edwards*, 35 M.J. 351, 355 (C.M.A. 1992).

BURRIS—ARMY 20150047

## CONCLUSION

On consideration of the entire record, the findings of guilty and the sentence are AFFIRMED.

Senior Judge TOZZI and Judge CELTNIEKS concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court